ACCEPTED
03-14-00660-CV
3999768
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/3/2015 12:09:58 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00660-CV

IN THE
THIRD DISTRICT COURT OF APPEALS
AT AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
2/3/2015 12:09:58 PM
JEFFREY D. KYLE
Clerk

CRAIG ZGABAY AND TAMMY ZGABAY,

Appellants

v.

NBRC PROPERTY OWNERS ASSOCIATION,

Appellee

Appeal from the 433rd Judicial District Court,
Comal County, Texas, Cause No. C2014-0501C

## APPELLEE'S BRIEF

Wade C. Crosnoe
State Bar No.  00783903
Brian D. Hensley
State Bar No. 24036759
Thompson, Coe, Cousins & Irons, LLP
701 Brazos, Suite 1500
Austin, Texas 78701
Telephone:  (512) 708-8200
Facsimile:  (512) 708-8777
E-mail:  wcrosnoe@thompsoncoe.com

Tom L. Newton, Jr.
State Bar No. 14982300
Allen, Stein & Durbin, P.C.
6243 IH-10 West, 7th Floor
P. O. Box 101507
San Antonio, Texas 78201
Telephone: (210) 734-7488
Facsimile: (210) 738-8036
E-mail: tnewton@asdh.com

Counsel for Appellee NBRC Property Owners Association

**Oral Argument Requested**

## IDENTITY OF PARTIES AND COUNSEL

1.    Appellants/Plaintiffs Craig and Tammy Zgabay

      Trial and Appellate Counsel:

      J. Patrick Sutton
      1706 W. 10th Street
      Austin, Texas 78703
      Telephone: (512) 417-5903
      Facsimile: (512) 355-4155

2.    Appellee/Defendant NBRC Property Owners Association

      Trial Counsel:

      Brian Hensley
      Thompson, Coe, Cousins & Irons, L.L.P.
      701 Brazos, Suite 1500
      Austin, Texas 78701
      Telephone: (512) 708-8200
      Facsimile: (512) 708-8777

      Tom L. Newton, Jr.
      Ashley Giordano
      Allen Stein & Durbin, P.C.[1]
      6243 IH-10 West, 7th Floor
      San Antonio, Texas 78201
      Telephone: (210) 734-7488
      Facsimile: (210) 738-8036

---

[1] Guillermo M. Hernandez, III also appeared as counsel in the trial court proceedings but is no longer with Allen Stein & Durbin, P.C.

i

Appellate counsel:

Wade C. Crosnoe
Brian D. Hensley
Thompson, Coe, Cousins & Irons, L.L.P.
701 Brazos, Suite 1500
Austin, Texas 78701
Telephone: (512) 708-8200
Facsimile: (512) 708-8777

Tom L. Newton, Jr.
Allen Stein & Durbin, P.C.

# TABLE OF CONTENTS

Identity of Parties and Counsel ..................................................................................i

Table of Contents ..................................................................................... iii

Index of Authorities ...................................................................................v

Statement of the Case........................................................................ viii

Statement Regarding Oral Argument ........................................................ix

Statement of Facts.....................................................................................1

Summary of the Argument........................................................................3

Argument....................................................................................................5

I.    The Rules of Construction for Restrictive Covenants.....................5

II.   Under Texas Law, Short-Term Rentals Are Not a Single-Family
      Residential Use .................................................................................9

III.  The Out-of-State Cases Are Distinguishable and Should Not Be
      Followed by This Court....................................................................15

IV.   The Zgabays' Challenge to the Alleged Vagueness of the Injunction
      Was Not Preserved and Lacks Merit................................................18

Conclusion and Prayer ............................................................................19

Certificate of Compliance .......................................................................20

Certificate of Service...............................................................................21

Appendix

Order on Competing Motions for Summary Judgment (CR 127–29) ............ Tab 1

Declaration of Covenants, Conditions and Restrictions for River Chase
Unit Three (CR 67–87) .......................................................... Tab 2

Tex. Prop. Code §§ 202.002, 202.003 ......................................... Tab 3

# INDEX OF AUTHORITIES

## Cases

*Applegate v. Colucci,* 908 N.E.2d 1214 (Ind. Ct. App. 2009)........................... 15, 17

*Ashcreek Homeowner's Ass'n v. Smith*, 902 S.W.2d 586 (Tex. App.—Houston [1st Dist.] 1995, no writ) ........................................................................7

*Benard v. Humble*, 990 S.W.2d 929 (Tex. App.—Beaumont 1999, pet. denied)........................................................................ 8, 9, 10, 14

*Cedar Oak Mesa, Inc. v. Altemate Real Estate, LLC*, No. 03-10-00067-CV, 2010 WL 3431703 (Tex. App.—Austin Aug. 31, 2010, no pet.).........................................................................................................11

*City of Pasadena v. Gennedy*, 125 S.W.3d 687 (Tex. App.—Houston [1st Dist.] 2003, pet. denied)....................................................................8

*Dunn v. Aamodt*, 695 F.3d 797 (8th Cir. 2012) ................................................. 15, 17

*Estates at Desert Ridge Trails Homeowners' Ass'n v. Vazquez*, 300 P.3d 736 (N.M. Ct. App. 2013).....................................................................16

*Highlands Mgmt. Co. v. First Interstate Bank*, 956 S.W.2d 749 (Tex. App.—Houston [14th Dist.] 1997, pet. denied)....................................................7

*InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.*, 715 S.W.2d 640 (Tex. 1986).............................................................................................18

*Int'l Bhd. of Elec. Workers Local Union 479 v. Becon Constr. Co.*, 104 S.W.3d 239 (Tex. App.—Beaumont 2003, no pet.) .....................................18

*Liberty Mut. Ins. Co. v. Adcock*, 412 S.W.3d 492 (Tex. 2013) ..............................6

*Lowden v. Bosley*, 909 A.2d 261 (Md. 2006) ..........................................................16

*Mason Family Trust v. Devaney*, 207 P.3d 1176 (N.M. Ct. App. 2009)........... 16, 17

*McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337 (Tex. 1993)............................................................................................................13

*Mullin v. Silvercreek Condo. Owner's Ass'n, Inc.*, 195 S.W.3d 484 (Mo. Ct. App. 2006)............................................................................... 15, 17

*Munson v. Milton*, 948 S.W.2d 813 (Tex. App.—San Antonio 1997, pet. denied) .................................................................... 7, 8, 10, 12, 14, 18

*Pinehaven Planning Bd. v. Brooks*, 70 P.3d 664 (Idaho 2003) ........................ 16, 17

*Quinn v. Harris*, No. 03-98-00117-CV, 1999 WL 125470 (Tex. App.—Austin March 11, 1999, pet. denied)............................................... 7, 8, 12

*Reagan Nat'l Adver. of Austin, Inc. v. Capital Outdoors, Inc.*, 96 S.W.3d 490 (Tex. App.—Austin 2002, pet. granted, judgm't vacated w.r.m.) ..................................................................................... 5, 8, 12

*Roaring Lion, LLC v. Exclusive Resorts PBL1, LLC*, No. CAAP-11-0001072, 2013 WL 1759002 (Haw. Ct. App. April 24, 2013).............. 15, 16, 17

*Ross v. Bennett*, 203 P.3d 383 (Wash. Ct. App. 2009) ...........................................16

*Russell v. Donaldson*, 731 S.E.2d 535 (N.C. Ct. App. 2012)........................... 16, 17

*Scott v. Walker*, 645 S.E.2d 278 (Va. 2007) .........................................................16

*Shields v. State*, 27 S.W.3d 267 (Tex. App.—Austin 2000, no pet.).......................18

*Slaby v. Mountain River Estates Residential Ass'n, Inc.*, 100 So. 3d 569 (Ala. Civ. App. 2012)..................................................................................16

*Slusher v. Streater*, 896 S.W.2d 239 (Tex. App.—Houston [1st Dist.] 1995, no writ) .................................................................................................10

*Smith v. Bd. of Regents of Univ. of Houston Sys.*, 874 S.W.2d 706 (Tex. App.—Houston [1st Dist.] 1994, writ denied)..........................................10

*Warehouse Partners v. Gardner*, 910 S.W.2d 19 (Tex. App.—Dallas 1995, writ denied) ...................................................................................10

*Wein v. Jenkins*, No. 03-04-00568-CV, 2005 WL 2170354 (Tex. App.—Austin Sept. 9, 2005, no pet.)..................................................................11

*Wilkinson v. Chiwawa Cmtys. Ass'n*, 327 P.3d 614 (Wash. 2014) ........................17

*Yogman v. Parrott*, 937 P.2d 1019 (Or. 1997)................................................. 16, 17

## Statutes

Tex. Gov't Code § 311.021(2) ..............................................................................6

Tex. Prop. Code § 92.152(a) .............................................................................10

Tex. Prop. Code § 202.002(a) ..............................................................................6

Tex. Prop. Code § 202.003(a) .................................................................... 5, 8, 16

Tex. Prop. Code § 202.004 ..................................................................................2

## Rules

Haw. R. App. P. 35 ............................................................................................15

Tex. R. App. P. 9.4(i)(1) ....................................................................................20

Tex. R. App. P. 9.4(i)(2)(B) ...............................................................................20

Tex. R. App. P. 33.1(a) ......................................................................................18

Tex. R. Civ. P. 166a(c) ......................................................................................13

Tex. R. Civ. P. 683 ...................................................................................... 18, 19

**Nature of the Case:** This is a declaratory-judgment action brought by two homeowners, Craig and Tammy Zgabay, seeking an interpretation of restrictive covenants governing a residential subdivision (CR[2] 6-10). Defendant NBRC Property Owners Association counterclaimed for injunctive relief, statutory damages, and attorney's fees (CR 11-15).

**Course of Proceedings:** The parties filed cross-motions for summary judgment (CR 18-51, 54-101; 102-21; SCR 7-35).

**Trial Court's Disposition:** The 433rd District Court of Comal County, the Honorable Dib Waldrip presiding, granted the Association's summary judgment motion and denied the Zgabays' motion (CR 127-29; Apx. 1). The court's order enjoined the Zgabays from renting their house to any person or the public for temporary or transient purposes, and awarded the Association statutory damages of $500 and attorney's fees of $3,422.50 (CR 129; Apx. 1).

---

[2] "CR" refers to the Clerk's Record. As used in this brief, "SCR" refers to the Supplemental Clerk's Record and "Apx." refers to the appendix attached to this brief.

## STATEMENT REGARDING ORAL ARGUMENT

The Association disagrees with the Zgabays' assertion that no precedent squarely addresses the issue in this case. Two published opinions by Texas courts address the same or a similar issue. Nevertheless, the Association believes that oral argument would help the Court in deciding the appeal because of the unsettled question on how to reconcile the statute mandating liberal construction of restrictive covenants with the common-law rule of strict construction.

**STATEMENT OF FACTS**

The Declaration of Covenants, Conditions and Restrictions for River Chase Unit Three—a residential subdivision in Comal County, Texas—was adopted and recorded in November 1999 (CR 67-87; Apx. 2). Among other provisions, the Declaration has restrictive covenants that (1) limit each tract to one dwelling unit to be used for "single family residential purposes" and (2) prohibit activities "not related to single family residential purposes" (CR 70, 72 [§§ 3.01, 3.14]; Apx. 2). The Declaration states that its "provisions . . . shall be liberally construed as a whole to effectuate the purpose of this Declaration" (CR 86 [§ 9.05]; Apx. 2).

The Declaration also created the NBRC Property Owners Association, consisting of all record owners of tracts, and the Association's Board of Directors (CR 67-68 [§§ 1.01, 1.02]; Apx. 2). The Board has the authority to enforce the Declaration's provisions, including through legal actions (CR 84 [§ 8.11]; Apx. 2).

Craig and Tammy Zgabay bought a lot in the River Chase subdivision in 2000 and built a house in 2004 (CR 50). They did not get around to reading the Declaration until later (CR 50). Upon reading the Declaration, Craig Zgabay allegedly concluded that it had no restrictions on leasing (CR 50). Early last year, he and his wife began renting the house for periods ranging from two to eight days,

1

and intend to continue with short-term rentals of the house (CR 50).[3]   According to a neighbor, the Zgabays' renters have used the neighbor's pool without permission during the night and played loud music at all hours (CR 90).[4]

After receiving complaints from neighbors (CR 88), the Board wrote to the Zgabays and demanded that they cease short-term rentals (CR 50).  The Zgabays responded by filing this declaratory-judgment action seeking a ruling that the restrictive covenants do not prohibit short-term leases (CR 6-10).  The Association responded with a counterclaim for injunctive relief, and also sought to recover statutory damages under section 202.004 of the Texas Property Code and attorney's fees (CR 11-14).

The parties filed cross-motions for summary judgment (CR 18-51, 54-101, 102-21; SCR 7-35).  After a hearing, the trial court granted the Association's motion and denied the Zgabays' motion (CR 127-29; Apx. 1; RR 1:1).  The court's summary judgment order enjoined the Zgabays from renting their house to any person or the public for temporary or transient purposes (CR 129; Apx. 1).  This appeal followed (CR 170-71).

---

[3] Although the Zgabays' brief asserts that they have moved and have leased the house for a one-year term (Appellants' Brief at 6-7), nothing in the record supports either assertion.
[4] The Zgabays' brief contends that the trial court struck the neighbor's affidavit and another affidavit filed with the Association's summary judgment motion (Appellants' Brief at 8).  But their supporting record cite is to a docket entry that indicates the trial court took the motion to strike those affidavits under advisement (CR 173).  The record contains no written order or oral ruling on the motion to strike.  Regardless, the affidavits are cited only for background purposes.

## SUMMARY OF THE ARGUMENT

The Zgabays' brief effectively asks this Court to disregard the Texas statute requiring liberal construction of restrictive covenants. But the Legislature must have meant to accomplish something when, in the face of the common-law rule requiring strict construction of restrictive covenants, it mandated liberal construction of all such covenants. This Court is not free to disregard the Legislature's pronouncement. And although Texas courts are split on the interplay between the statute and common-law rule, under the approach this Court follows the common-law rule never comes into play unless the restrictive covenant is ambiguous. Neither side in this case argues that the restrictive covenant is ambiguous. The common-law rule is therefore irrelevant, and the statutory rule of liberal construction controls.

The Texas rule of liberal construction goes a long way toward explaining the differing results reached by Texas courts and some out-of-state courts. Texas courts have held that virtually-identical or similar restrictive covenants prohibit short-term rentals. Against the backdrop of liberal construction, those Texas courts have reasoned that residency generally requires a fixed place of habitation and an intent to remain despite temporary absences. When, as here, a series of families or other groups stay in a rental house for a few nights or less, the house is not the

residence of any of them. It certainly is not being used for "single family residential purposes" under the wording of the covenants at issue here.

To be sure, courts in some other states have reached contrary conclusions. But those decisions from twelve other states—out of fifty, last we checked—are hardly the "overwhelming tide" that the Zgabays portray them to be. More importantly, those decisions generally turn on the rule of strict construction followed in those states. In this state, the converse rule of construction is mandated by statute. The Zgabays should take their complaint that Texas will be out of step with other states to the Texas Legislature. Meanwhile, this Court should follow the legislative rule of liberal construction and the Texas cases holding that similar restrictive covenants prohibit short-term rentals.

## I.    The Rules of Construction for Restrictive Covenants

Under the common law, restrictive covenants are subject to the traditional rules of contract construction. *See, e.g., Reagan Nat'l Adver. of Austin, Inc. v. Capital Outdoors, Inc.*, 96 S.W.3d 490, 493 n.2 (Tex. App.—Austin 2002, pet. granted, judgm't vacated w.r.m.). The goal is to determine the drafters' objective intent by examining the entire instrument. *Id.* at 493. But any "[d]oubts about the meaning of a covenant are resolved against the party seeking to enforce it and in favor of the free and unrestricted use of land." *Id.*

In 1987, however, the Texas Legislature altered the common-law rule. The Legislature amended the Texas Property Code to mandate liberal construction of restrictive covenants:

> A restrictive covenant shall be liberally construed to give effect to its purposes and intent.

Tex. Prop. Code § 202.003(a) (Apx. 3). Notably, the Declaration at issue adopts this statutory rule of construction, stating that "[t]he provisions of this Declaration shall be liberally construed as a whole to effectuate the purpose of this Declaration" (CR 86 [§ 9.05]; Apx. 2).

The Zgabays make various arguments about how the common-law rule supposedly is more specific and should effectively trump the statute (and the contract provision adopting the statute). But just like the common-law rule once

did, the statute applies to all restrictive covenants. *See* Tex. Prop. Code § 202.002(a) (Apx. 3).  One is no more specific than the other.

The Zgabays argue that the trial court gave "undue weight" to the statutory rule (Appellants' Brief at 10).   By this they appear to mean that the trial court should not have given any weight to the statute.   But that approach runs afoul of the rule of statutory construction that the entire statute is intended to be effective. *See* Tex. Gov't Code § 311.021(2).  Under the Zgabays' reading of the statute, the Legislature accomplished nothing when it mandated liberal construction of all restrictive covenants.  The courts are not free, however, to disregard legislative pronouncements. *See Liberty Mut. Ins. Co. v. Adcock*, 412 S.W.3d 492, 493-94 (Tex. 2013) (stating that it is not the court's province to override a legislative determination and that the "primary objective in constructing a statute is to ascertain and give effect to the Legislature's intent").

In any event, the trial court certainly did not give "undue weight" to the statutory rule.  The summary judgment order expressly states that the court balanced the statute requiring liberal construction of restrictive covenants with the common-law rule of strict construction (CR 127; Apx. 1).  Given that the statute "applies to all restrictive covenants regardless of the date on which they were created," *see* Tex. Prop. Code § 202.002(a), the only way the trial court erred, if at

all, was in giving any weight to the common-law rule. But the Zgabays can hardly complain about that.

Though not necessarily correct, the trial court's attempt to balance the rules was certainly understandable in light of (1) the lack of guidance from the Supreme Court of Texas on the interplay of the statute and the common-law rule and (2) the lack of agreement in the courts of appeals. As this Court has noted, its sister courts have taken differing approaches on this question. *See Quinn v. Harris*, No. 03-98-00117-CV, 1999 WL 125470, at *2 n.3 (Tex. App.—Austin March 11, 1999, pet. denied). Some have said that there is no conflict between the rules without explaining how they fit together. *Id.* (citing, e.g., *Ashcreek Homeowner's Ass'n v. Smith*, 902 S.W.2d 586, 588-89 (Tex. App.—Houston [1st Dist.] 1995, no writ)). Other courts seem to have concluded that the statute trumps the common-law rule entirely. *Id.* (citing *Highlands Mgmt. Co. v. First Interstate Bank*, 956 S.W.2d 749, 752 (Tex. App.—Houston [14th Dist.] 1997, pet. denied)). And still others have attempted to harmonize the standards by liberally construing restrictive covenants to determine the drafters' intent but if that intent is ambiguous, then strictly construing the covenant in favor of the unrestricted use of property. *Id.* (citing *Munson v. Milton*, 948 S.W.2d 813, 816 (Tex. App.—San Antonio 1997, pet. denied)); *see also City of Pasadena v. Gennedy*, 125 S.W.3d 687, 693-95 (Tex.

App.—Houston [1st Dist.] 2003, pet. denied) (collecting cases and discussing various approaches).

This Court follows the *Munson* approach of harmonizing the statute and common-law rule. *See Quinn*, 1999 WL 125470, at *2 n.3; *Reagan Nat'l Advert. of Austin, Inc.*, 96 S.W.3d. at 493 n.2. Under this approach, the common-law rule does not come into play unless the restrictive covenant is ambiguous. *See Quinn* 1999 WL 125470, at *2 n.3 (citing *Munson*, 948 S.W.2d at 816). As noted by the trial court, the parties in this case agree that the applicable restrictive covenants are unambiguous (CR 127; Apx. 1). The Zgabays do not contend otherwise on appeal, and do not explain how the common-law rule would come into play under the *Munson* approach in the absence of an ambiguity. Thus, the common-law rule has no relevance to this appeal.

For the record, however, the Association does not believe the common-law rule survived the enactment of section 202.003(a). That statute mandates liberal construction of all restrictive covenants—presumably even ambiguous ones. It is difficult to understand why liberal construction should not require interpreting ambiguous restrictive covenants in favor of the person seeking enforcement when strict construction requires the exact opposite—that is, interpreting ambiguous covenants against such persons. *See Benard v. Humble*, 990 S.W.2d 929, 930-31 (Tex. App.—Beaumont 1999, pet. denied) (concluding that the Legislature

8

intended for restrictive covenants to be construed in a manner that might "run hard afoul of the strict common law requirements," and noting that the court would have reached a different result if strict construction applied).

## II. Under Texas Law, Short-Term Rentals Are Not a Single-Family Residential Use

The Zgabays' forty-page brief devotes less than two pages to discussing the two leading Texas cases on the short-term rental issue: *Benard* and *Munson*. In the former case, the Beaumont Court of Appeals interpreted a restrictive covenant stating that "[n]o lot shall be used except for single-family residential purposes." *See Benard*, 990 S.W.2d at 930. That covenant is virtually identical to the restrictive covenants in this case, which likewise limit use to "single family residential purposes" (CR 70, 72 [§3.01, 3.14]; Apx. 2). The *Benard* court held that the trial court did not err in ruling that the covenant prohibited renting for periods of less than ninety days. *Id.* at 930-32.

Although the *Benard* court agreed that renting was not prohibited per se, the court explained that renting a house on a weekly or weekend basis is more akin to temporary or transient housing rather than residential housing. *Id.* at 931. The court analogized to cases involving residency requirements for voting or obtaining a divorce, and observed that residency typically requires a fixed place of habitation and intent to remain or return despite any temporary absences. *Id.* at 931-32 (citing *Slusher v. Streater*, 896 S.W.2d 239, 243-44 (Tex. App.—Houston [1st

Dist.] 1995, no writ)).  In reaching this result, the Court noted the outcome might have been different if the common-law rule of strict construction applied but concluded it was compelled to give effect to the statutory mandate of liberal construction.  *Id.* at 930-31.

In *Munson*, the San Antonio Court of Appeals addressed a restrictive covenant requiring that lots be used for "residential, camping or picnicing [sic] purposes" and not "for business purposes." *Munson*, 948 S.W.2d at 815. The court agreed that the trial court's temporary injunction against all rentals was too broad and modified it to prevent only leasing "to the public for temporary or transient housing purposes." *Id.* at 817.  In concluding that such rentals were prohibited, the court of appeals reasoned that residence generally requires both physical presence and intent to remain.  *Id.* at 816 (citing, e.g., *Smith v. Bd. of Regents of Univ. of Houston Sys.*, 874 S.W.2d 706, 712 (Tex. App.—Houston [1st Dist.] 1994, writ denied)).  Thus, when a person comes to a place temporarily, without any intention of making the place his or her home, the place is not the person's residence.  *Id.* at 817.    The *Munson* court further reasoned that the Texas Property Code distinguishes between a permanent residence and transient housing.  *Id.* (citing *Warehouse Partners v. Gardner*, 910 S.W.2d 19, 23 (Tex. App.—Dallas 1995, writ denied); Tex. Prop. Code § 92.152(a)).

10

This Court has not squarely addressed whether a similar restrictive covenant bars short-term rentals. In one case, however, the Court upheld a permanent injunction that interpreted a "single-family, private residential purposes" restriction to preclude operating a "bed & breakfast," hotel, inn, or venue for parties, business meetings, or retreats. *See Wein v. Jenkins*, No. 03-04-00568-CV, 2005 WL 2170354, at \*1-3 (Tex. App.—Austin Sept. 9, 2005, no pet.). In rejecting the contention that the plaintiffs received greater relief than they requested, this Court observed that the trial court's interpretation of what the phrase "single-family, private residential purposes" does not include—e.g., bed & breakfast, inn, etc.— was "consistent with both the plain language and the underlying purpose" of the restriction. *Id.* at \*2. This statement strongly suggests that similarly-transient uses (such as short-term rentals) are not single-family residential uses either.

In another case, this Court held that a restrictive covenant stating that no more than one "private dwelling house" could be erected on each lot was ambiguous as to whether it prohibited short-term rentals, and remanded that fact issue for trial. *See Cedar Oak Mesa, Inc. v. Altemate Real Estate, LLC*, No. 03-10-00067-CV, 2010 WL 3431703, at \*2-5 (Tex. App.—Austin Aug. 31, 2010, no pet.). As noted, however, neither side in this case contends the restrictive covenants are ambiguous. Also, the wording of the covenants—"single family residential purposes"—is markedly different than the "private dwelling" language

11

in *Cedar Oak Mesa*. Presumably because of those distinctions, the Zgabays cite *Cedar Oak Mesa* but do not contend that its reasoning controls here.

Finally, this Court has found the *Munson* court's analysis persuasive on the interplay between the statutory and common-law rules of construction. *See Reagan Nat'l Advert. of Austin, Inc.*, 96 S.W.3d at 493 n.2; *Quinn v. Harris*, 1999 WL 125470, at *2 n.3. In doing so, the Court did not express any doubts about *Munson*'s reasoning on the short-term rental issue.

The Zgabays nevertheless argue that this Court should not follow *Munson* on the merits. They attempt to distinguish the restrictive covenant in *Munson* based on its express prohibition on business uses, and its language clarifying that motels, tourist courts, and trailer parks are business uses. *Munson*, 948 S.W.2d at 815. On the flipside, however, the *Munson* restrictive covenant lacked the additional requirement found in the covenants in this case, which require that the residential use be "single family." Entering into a series of short-term rentals with separate families (or other groups) is not a "single family" use.

Moreover, both *Munson* and *Bernard* relied on well-established Texas law in distinguishing between temporary and residential housing. Both courts are surely correct that residential housing does not encompass the temporary or transient presence that is the hallmark of short term-rental housing. This Court should rule likewise.

12

Given the unfavorable Texas law, the Zgabays resort to novel appellate arguments. They contend that (1) the trial court effectively imposed an occupancy requirement the Zgabays cannot meet because they no longer live in the house and (2) the restrictive covenants elsewhere distinguish between temporary and permanent structures but not between temporary and permanent residence. But they never made either argument in their summary judgment papers, and have therefore waived them for appeal. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) (stating that grounds for or against summary judgment must be expressly presented in the motion or response); Tex. R. Civ. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal.")

Regardless, the trial court's order imposes no "occupancy" requirement. It does not require that the Zgabays or anyone else occupy the house. The order simply enjoins the Zgabays from renting to the public for temporary or transient purposes (CR 129; Apx. 1).

The Zgabays' other argument mixes apples and oranges or, more aptly, permitted structures and permitted uses. Section 3.04 of the Declaration generally bars temporary residential structures, with certain exceptions (CR 71; Apx. 2). On the other hand, the provisions at issue here—sections 3.01 and 3.14—limits use of

13

the permanent structure to single-family residential purposes (CR. 70; Apx. 2). Section 3.04 does not speak to or imply anything about whether a short-term rental is a permitted use. But by limiting use to single-family residential purposes, sections 3.01 and 3.14 confirm that temporary use for short-term rentals is not allowed. *See Benard*, 990 S.W.2d at 930-32; *Munson*, 948 S.W.2d at 815-17.

The Zgabays say that the test for single-family residential use should be "whether natural persons (or a "single family," whatever that may encompass) occupy the property consistent with the property's nature as a place for dwelling as opposed to a place for those persons' conducting of a trade or commercial enterprise on the property" (Appellants' Brief at 29). They cite no Texas case or any other authority for this proposed test. They also fail to recognize that their use fails their own test. Even if one accepts the dubious proposition that temporary occupancy of property equates to residence, a "single family" is not occupying the property when it is rented for short periods to either successive families or successive other groups.

Crucially, the Zgabays also concede that the duration of the lease may be relevant to their proposed test (Appellants' Brief at 30). But it is difficult to imagine much shorter durations than the periods the Zgabays have leased their house for (two to eight days), or the one-night rentals that they say would also be

14

permissible (CR 50; Appellants' Brief at 29, 37). Once again, the Zgabays' use fails their own test.

## III. The Out-of-State Cases Are Distinguishable and Should Not Be Followed by This Court

Finding no support in Texas law, the Zgabays turn to decisions by courts outside the state (Appellants' Brief at 33-34). But the "overwhelming tide" of out-of-state cases they cite consists of decisions from just twelve other states. In seven of those twelve states, the issue has not been decided by the state's highest court. And one of the decisions—*Roaring Lion, LLC v. Exclusive Resorts PBL1, LLC*, No. CAAP-11-0001072, 2013 WL 1759002 (Haw. Ct. App. April 24, 2013)—is a memorandum opinion that is not even precedent under Hawaiian law. *See* Haw. R. App. P. 35. Even at first blush, the out-of-state cases are hardly overwhelming.

Closer inspection further undermines the Zgabays' reliance on the out-of-state cases. First and foremost, the result in most of those cases turned on the common-law rule requiring strict construction of ambiguous restrictive covenants. *See, e.g., Dunn v. Aamodt*, 695 F.3d 797, 799-802 (8th Cir. 2012) (applying Arkansas law)[5]; *Applegate v. Colucci*, 908 N.E.2d 1214, 1220 (Ind. Ct. App. 2009); *Mullin v. Silvercreek Condo. Owner's Ass'n, Inc.*, 195 S.W.3d 484, 490 (Mo. Ct. App. 2006); *Estates at Desert Ridge Trails Homeowners' Ass'n v.*

---

[5] The Zgabays' brief cites only the district court's unpublished decision, which was affirmed by the Eighth Circuit.

15

*Vazquez*, 300 P.3d 736, 740-43 (N.M. Ct. App. 2013); *Mason Family Trust v. Devaney*, 207 P.3d 1176, 1178-79 (N.M. Ct. App. 2009); *Russell v. Donaldson*, 731 S.E.2d 535, 538-39 (N.C. Ct. App. 2012); *Yogman v. Parrott*, 937 P.2d 1019, 1022-24 (Or. 1997); *Scott v. Walker*, 645 S.E.2d 278, 283 (Va. 2007); *see also Pinehaven Planning Bd. v. Brooks*, 70 P.3d 664, 668-69 (Idaho 2003) (alternative holding was based on rule of strict construction).[6]

None of the out-of-state cases applies a statute that, like section 202.003(a) of the Texas Property Code, requires liberal construction of all restrictive covenants. Given the unique Texas statute, it is hardly surprising that Texas courts have reached a different result than courts in other states. Needless to say, however, foreign cases applying a common-law rule of strict construction have little to no relevance in Texas cases where liberal construction is mandated.

Beyond the diametrically-opposed rules of construction, the out-of-state cases are distinguishable for other reasons:

- Several cases involved restrictive-covenant language that does not include a residential-use restriction. *See Pinehaven Planning Bd.*, 70 P.3d at 668 (addressing covenant limiting construction to one

---

[6] Of the remaining five cases, the two Washington cases indicate that Washington courts no longer strictly construe restrictive covenants. *See Wilkinson v. Chiwawa Cmtys. Ass'n*, 327 P.3d 614, 619 (Wash. 2014); *Ross v. Bennett*, 203 P.3d 383, 387 (Wash. Ct. App. 2009). In a third case, the court noted the rule of strict construction for ambiguous restrictive covenants but held that the covenant at issue was unambiguous. *See Lowden v. Bosley*, 909 A.2d 261, 266-69 (Md. 2006). In two other cases, the court mentioned the rule of strict construction but it is not clear whether the courts' holdings on the short-term rental issue turned on strict construction of the restrictive covenants. *See Slaby v. Mountain River Estates Residential Ass'n, Inc.*, 100 So. 3d 569, 578 (Ala. Civ. App. 2012); *Roaring Lion, LLC*, 2013 WL 1759002, at *4-5.

16

single-family dwelling per lot and prohibiting commercial use; distinguishing the San Antonio Court of Appeals' decision in *Munson* as involving narrower residential-use language); *Mason Family Trust*, 207 P.3d at 1178 (addressing dwelling-use limitation and prohibition on commercial use, and distinguishing *Munson* on the same basis); *Russell*, 731 S.E.2d at 538 (interpreting covenant prohibiting use of land for business or commercial purposes and distinguishing cases involving residential-use restrictions).

- A number of the cases interpreted covenants that limited use to residential or dwelling use but did not add the "single family" qualifier present here. *See Dunn*, 695 F.3d at 798; *Applegate*, 908 N.E.2d at 1217; *Roaring Lion, LLC*, 2013 WL 1759002, at *1-2; *Mason Family Trust*, 207 P.3d at 1177; *Russell*, 731 S.E.2d at 537; *Yogman*, 937 P.2d at 1020.

- In some cases, there was evidence that short-term rentals were widely allowed in the subdivision. *See Mullin*, 195 S.W.3d at 490-91 (discussing the evidence that from the beginning, condominium units had been rented on a short-term or nightly basis); *Wilkinson*, 327 P.3d at 617 (stating that subdivision residents had entered into short-term rentals for decades without controversy).

- The restrictive covenants in one case incorporated definitions from that state's Uniform Business Code, which defined residential use to include apartments and lodging houses. *See Pinehaven Planning Bd.*, 70 P.3d at 668.

Viewed in light of all of these distinctions, including the dispositive distinction of liberal versus strict construction, the Zgabays' "overwhelming tide" is a trickle at best. This Court should follow the Texas cases and the Texas statute mandating liberal construction of restrictive covenants.

17

**IV. The Zgabays' Challenge to the Alleged Vagueness of the Injunction Was Not Preserved and Lacks Merit**

The Zgabays also argue that the permanent injunction is too vague to be enforced. But they never raised that argument in the trial court, either in their summary judgment response or in a motion to modify the injunction. As a result, their vagueness challenge is not preserved for appeal. *See Shields v. State*, 27 S.W.3d 267, 273 (Tex. App.—Austin 2000, no pet.) (holding that defendant waived complaint about order not stating reasons for permanent injunction by failing to raise complaint in trial court, citing Tex. R. App. P. 33.1(a)).[7]

In any event, the language in the trial court's order—enjoining the Zgabays "from renting their property . . . to any person or the public for temporary or transient purposes" (CR 129; Apx. 1)—is based upon and nearly identical to the language approved by the *Munson* court. *See Munson*, 948 S.W.2d at 817 (modifying injunction to enjoin appellants from "renting and/or leasing said property to the public for temporary or transient housing purposes.") Moreover, the trial court's order elaborates that residential use "means to occupy a place over

---

[7] Other Texas courts have held that complaints about an injunction's failure to comply with Tex. R. Civ. P. 683 cannot be waived because the requirements of that rule are mandatory. *See, e.g., Int'l Bhd. of Elec. Workers Local Union 479 v. Becon Constr. Co.*, 104 S.W.3d 239, 243 (Tex. App.—Beaumont 2003, no pet.) (citing *InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.*, 715 S.W.2d 640, 641 (Tex. 1986)). But both cases involved temporary (rather than permanent) injunctions, which have differing requirements under Rule 683. *Interfirst Bank* involved a failure to comply with a separate requirement of Rule 683 (the requirement that a temporary injunction order set the case for trial), and there apparently was no appellate argument that the complaint was waived. *See InterFirst Bank San Felipe, N.A.*, 715 S.W.2d at 640-41.

a substantial period such that it is permanent rather than temporary evidenced by one's physical presence simultaneous with a then-existing intent to remain" (CR 128; Apx. 1). Read in its entirety, the order satisfies the requirement that the act sought to be restrained be described in "reasonable detail." *See* Tex. R. Civ. P. 683.[8]

## CONCLUSION AND PRAYER

For these reasons, the trial court's summary judgment order and injunction should be affirmed. The Association also requests all other relief to which it is justly entitled, including an award of its appeal costs.

---

[8] The Zgabays are not entitled to remand for an award of attorney's fees because they have not demonstrated any reversible error in the trial court's judgment.

Respectfully submitted,

THOMPSON, COE, COUSINS & IRONS, L.L.P.

By: /s/ Wade Crosnoe
    Wade C. Crosnoe
    State Bar No. 00783903
    Brian D. Hensley
    State Bar No. 24036759

701 Brazos, Suite 1500
Austin, Texas 78701
Telephone: (512) 708-8200
Facsimile: (512) 708-8777
E-Mail: wcrosnoe@thompsoncoe.com
          bhensley@thompsoncoe.com

Tom L. Newton, Jr.
State Bar No. 14982300
Allen, Stein & Durbin, P.C.
6243 IH-10 West, 7th Floor
P. O. Box 101507
San Antonio, Texas 78201
Telephone: (210) 734-7488
Facsimile: (210) 738-8036
E-Mail: tnewton@asdh.com

Counsel for Appellee NBRC Property Owners Association

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Tex. R. App. P. 9.4(i)(2)(B) because it contains 4,447 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i)(1).

/s/ Wade Crosnoe
Wade Crosnoe

20

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this Appellee's Brief was served on February 3, 2014, via electronic service or email, to the following counsel:

J. Patrick Sutton
1706 W. 10th Street
Austin, Texas 78703
E-Mail: jpatricksutton@jpatricksuttonlaw.com
*Counsel for Appellants*


/s/ Wade Crosnoe
Wade Crosnoe

# APPENDIX

# APPENDIX
# Tab 1
## Order on Motions for Summary Judgment



150 N. Seguin, Suite 317
New Braunfels, Texas 78130

830-620-5562
Fax 830-608-2030



**DIB WALDRIP**
PRESIDING JUDGE

433RD JUDICIAL DISTRICT COURT
COMAL COUNTY

September 19, 2014

**Cause No. C2014-0501C**

| | | |
|---|---|---|
| **CRAIG ZGABAY AND** | § | **IN THE DISTRICT COURT** |
| **TAMMY ZGABAY** | § | |
| Plaintiffs/Counter-Defendant | § | |
| **vs.** | § | **433rd JUDICIAL DISTRICT** |
| | § | |
| **NBRC PROPERTY OWNERS** | § | |
| **ASSOCIATION** | § | |
| Defendant/Counter-Plaintiff | § | **COMAL COUNTY, TEXAS** |

## ORDERS ON COMPETING MOTIONS FOR SUMMARY JUDGMENT

**CAME ON TO BE CONSIDERED** Plaintiffs'/Counter-Defendants' Craig and Tammy Zgabay (hereinafter "Zgabay") and Defendant's/Counter-Plaintiff's NBRC Property Owners Association (hereinafter "NBRC") competing Motions for Summary Judgment.

Among other matters, both parties principally seek reciprocal declarative relief regarding the subject Declaration of Covenants, Conditions and Restrictions to River Chase Subdivision, Unit Three. The parties agree the applicable provisions of the restrictive covenants are not ambiguous. While it is the Court's duty to determine the intent of the drafter of the covenants, the Court must do so balancing both statutory requirements to liberally construe language within such subdivision covenants with common law mandates to strictly construe restrictive clauses in real estate instruments resolving all doubt in favor of the free use of real estate. *See generally, Benard v. Humble*, 990 S.W.2d 929, 930 (Tex.App.—Beaumont 1999, *writ ref'd n.r.e.*) (noting the invariable legal conflict).

127 \u

After considering the Motions, the responses, the pleadings, the evidence properly before the Court, and the arguments of counsel, the Court determines that the Defendant's/Counter-Plaintiff's Motion should be and is hereby **GRANTED** while the Plaintiffs'/Counter-Defendants' Motion should be and is hereby **DENIED** for the following reasons.

The parties do not differ nor argue about the summary judgment evidence, and key word central to the instant dispute from within the subject covenants is the word "residential." Common law authorities whose opinions are controlling upon this Court from the United States and Texas Supreme Courts along with the 3rd Court of Appeals in Austin hold, for various purposes and reasons, that a "residence" is a place occupied over a substantial period such that it is permanent rather than temporary evidenced by one's physical presence simultaneous with a then-existing intent to remain. *See generally, Martinez v. Bynum*, 461 U.S. 321, 103 S.Ct. 1838, 1843, 75 L.Ed.2d 879 (1983) ("Although the meaning may vary according to context, 'residence' generally requires both physical presence and an intention to remain."), *Mills v Bartlett*, 377 S.W.2d 636, 637 (Tex. 1964) ("Neither bodily presence alone nor intention alone will suffice to create the residence, but when the two coincide at that moment the residence is fixed and determined."); *Howell v. Mauzy*, 899 S.W.2d 690, 697 n. 9 (Tex.App.—Austin 1994, *writ denied*) (residence is a fixed place of abode occupied substantially enough to become permanent).

Although the legislature has assigned differing minimum lengths of time (i.e., 30 days to 6 months) in order that a person might obtain some various benefit or avoid some various consequence, the Texas Supreme Court held in *Mills, supra*, that for a purpose of residency under the Texas Election Code "no specific length of time [is required] for the bodily presence to continue." *Mills, supra at* 637. The San Antonio Court of Appeals, albeit in construction of a more specific set of covenants than are at issue here, noted the well-recognized distinction in Texas law between a permanent residence and temporary housing. *Munson v. Milton*, 948 S.W.2d 813, 816-17 (Tex.App.—San Antonio 1997, *writ denied*). Without ascribing any specific length of time or bright-lined rule, the San Antonio Court modified the lower court's injunction enjoining a homeowner from "renting and/or leasing [the subject] property to the public for lodging, vacation and recreation purposes" to prohibit "renting and/or leasing [the subject] property to the public for temporary or transient housing purposes." *Id. at* 815 & 817.

Based upon the existing and proper summary judgment record, the Court has no doubt regarding the intent of the drafter of the instant covenants. The covenants, created and filed in 1999, clearly allow properties to be rented or leased for residential purposes consistent with the then-existing common law understanding and meaning of that word at that time. Thus, the Court declares that, within the Declaration of Covenants, Conditions and Restrictions for River Chase Unit Three—as used in the phrase single-family residential purposes, to be "residential" means to occupy a place over a substantial period such that it is permanent rather than temporary evidenced by one's physical presence simultaneous with a then-existing intent to remain.

Accordingly, it is **ORDERED** that Counter-Plaintiff NBRC is entitled to injunctive relief against Counter-Defedants Zgabay restraining them from renting their property located at 1175 River Chase Drive, New Braunfels, Texas 78132 (hereinafter the "Property") to any person or the public for temporary or transient purposes.

It is **FURTHER ORDERED** that consistent with the Declaration of covenants, Conditions and Restrictions for River Chase Unit Three, which is applicable to the Property, neither Counter-Defendants Zgabay, nor their tenants, assigns, heirs or successors, shall allow or cause the Property to be rented, sub-rented, leased or subleased to any person or the public for temporary or transient purposes.

It is **FURTHER ORDERED** that Plaintiffs/Counter-Defendants Zgabay take nothing against Defendant/Counter-Plaintiff NBRC and that all claims asserted by Plaintiff/Counter-Defendant Zgabay are denied and that all costs of court be taxed against Plaintiff and that Defendant/Counter-Plaintiff NBRC recover from Plaintiffs $3,422.50 as reasonable and necessary attorney's fees and $500.00 as statutory damages.

**IT IS SO ORDERED** on this the 19TH day of September, 2014.

**Dib Waldrip**
**Presiding Judge**

# APPENDIX
# Tab 2
**Declaration of Covenants, Conditions and Restrictions for River Chase Unit Three**

Document Number 9906031412 is re-recorded to correct Page 8.
This document as re-recorded replaces Document Number 9906031412

## DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS
## RIVER CHASE UNIT THREE

STATE OF TEXAS       *

                           KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF COMAL      *

     This Declaration made on the date hereinafter set forth by TEXAS SOUTHERLAND VENTURE, formerly known as TEXAS SUMMERLIN VENTURE, a Massachusetts Joint Venture, acting herein by and through its duly authorized Joint Venturer, SOUTHERLAND PROPERTIES, INC., formerly known as SUMMERLIN PROPERTIES, INC., a Texas Corporation, duly authorized to do business in the State of Texas, hereinafter referred to as "Developer".

### WITNESSETH:

     WHEREAS, Developer is the owner of that certain tract of land known as RIVER CHASE UNIT TWO, being a subdivision containing 741.43 acres out of a 1494.671 acre tract of land situated in Comal County, Texas (hereinafter referred to as the "Property" or the "Subdivision") with the Plat of RIVER CHASE UNIT THREE, being recorded in the office of the County Clerk of Comal County, Texas on the 5th day of November, 1999, after having been approved as provided by law, and being recorded in Book Volume 13, Pages 131-136, of the Map Records of Comal County, Texas; and,

     WHEREAS, it is the desire of Developer to place certain restrictions, easements, covenants, conditions, stipulations and reservations (herein sometimes referred to as (the "Restrictions") upon and against RIVER CHASE UNIT THREE in order to establish a uniform plan for its development, improvement and sale, and to insure the preservation of such uniform plan for the benefit of both the present and future owners of tracts in RIVER CHASE UNIT THREE.

     NOW, THEREFORE, Developer hereby adopts, establishes and imposes upon RIVER CHASE UNIT THREE, and declares the following reservations, easements, restrictions, covenants and conditions applicable thereto all of which are for the purposes of enhancing and protecting the value, desirability and attractiveness of said Property, which Restrictions shall run with said Property and title or interest therein, or any part thereof, and shall inure to the benefit of each owner thereof. Developer also declares that RIVER CHASE UNIT THREE shall be subject to the jurisdiction of the "Association" (as hereinafter defined).

### ARTICLE I
### DEFINITIONS

Section1.01 "Association" shall mean and refer to the NBRC PROPERTY OWNERS ASSOCIATION, and its successors and assigns. Notwithstanding anything herein to the contrary, the NBRC PROPERTY OWNERS ASSOCIATION shall consist of members from all Sections and Units within the Property. It is intended that only one NBRC PROPERTY OWNERS ASSOCIATION exists for the whole of the 1494.671 acres and for any other property hereafter subjected to these restrictions.

EXHIBIT

_A_

67

Section1.02 "Board of Directors" shall mean and refer to the Board of Directors of the Association.

Section1.03 "Builders" shall mean and refer to persons or entities that purchase tracts and build speculative or custom homes thereon for third party purchasers.

Section1.04 "Common Area" shall mean all real Property (including the improvements thereon) within the Subdivision owned by the Developer and/or the Association for the common use and enjoyment of the Owners.

Section1.05 "Contractor" shall mean and refer to the person or entity with whom an Owner contracts to construct a residential dwelling on such Owner's Tract.

Section1.06 "Developer" shall mean and refer to TEXAS SOUTHERLAND VENTURE, a Massachusetts Joint Venture, acting herein by and through its duly authorized Joint Venturer, SOUTHERLAND PROPERTIES, INC., a Texas Corporation, its successors and assigns.

Section1.07 "Tract" shall mean and refer to any plot of land identified as a parcel or home site on the Plat of RIVER CHASE UNIT THREE. For purposes of this instrument, "Tract" shall not be deemed to include any portion of the "Common Areas" or "Unrestricted Reserves", (defined herein as any Common Areas and Unrestricted Reserves shown on the Plat) in RIVER CHASE UNIT THREE, regardless of the use made of such area.

Section1.08 "Member" shall mean and refer to every person or entity who holds a membership in the Association.

Section1.09 "Owner" shall mean and refer to the record owner, whether one or more persons or entities, of fee simple title to any tract which is a part of the Subdivision, including (i) contract seller (a seller under a Contract for Deed), but excluding those having such interest merely as security for the performance of an obligation, (ii) Developer (except as otherwise provided herein), and (iii) Builders.

Section1.10 "Section" The words "Section(s)" and "Unit(s)" are used interchangeable within these Restrictions to refer to a particular tract of land designated on each filed map or plat of RIVER CHASE.

## ARTICLE II
## RESERVATIONS, EXCEPTION AND DEDICATIONS

Section2.01 Recorded Subdivision Map of the Property. The Plat ("Plat") of RIVER CHASE UNIT THREE dedicates for use as such, subject to the limitations as set forth therein, the roads, streets and easements shown thereon. The Plat further establishes certain restrictions applicable to RIVER CHASE UNIT THREE. All dedications, restrictions and reservations created herein or shown on the Plat, replats or amendment of the Plat of RIVER CHASE UNIT THREE recorded or hereafter recorded shall be construed as being included in each contract, deed, or conveyance executed

2


Doc# 9906031628

or to be executed by or on behalf of Developer, whether specifically referred to therein or not.

Section 2.02 Easements. Developer reserves for public use the utility easements shown on the Plat or that have been or hereafter may be created by separate instrument recorded in the Official Public Records of Comal County, Texas, for the purpose of constructing, maintaining and repairing a system or systems of electric lighting, electric power, telegraph and telephone line or lines, storm surface drainage, cable television, or any other utility the Developer sees fit to install in, across and/or under the Property. All utility easements in the Subdivision may be used for the construction of drainage swales in order to provide for improved surface drainage of the Reserves, Common Area and/or Tracts. Should any utility company furnishing a service covered by the general easement herein provided or provided on the plat request a specific easement within the general easement area by separate recordable document, Developer, without the joinder of any other Owner, shall have the right to grant such easement on said Property without conflicting with the terms hereof. Any utility company serving the Subdivision shall have the right to enter upon any utility easement for the purpose of installation, repair and maintenance of their respective facilities. Neither Developer nor any utility company, political subdivision or other authorized entity using the easements herein referred to shall be liable for any damages done by them or their assigns, agents, employees, or servants, to fences, shrubbery, trees and laws or any other Property of the Owner on the Property covered by said easements.

Section 2.03 Title Subject to Easements. It is expressly agreed and understood that the title conveyed by developer to any of the Tracts by deed, contract for deed or other conveyance shall be subject to any easement affecting same for roadways or drainage, electric lighting, electric power, telegraph or telephone purposes and other easements hereafter granted affecting the Tracts. The Owners of the respective Tracts shall not be deemed to own pipes, wires, conduits or other service lines running through their Tracts which are utilized for or service to other Tracts, but each Owner shall have an easement in and to the aforesaid facilities as shall be necessary for the use, maintenance and enjoyment of his Tract. The Developer may convey title to the above said easements to the public, a public utility company or the Association.

Section 2.04 Utility Easements.

    (a)    Utility ground and aerial easements have been dedicated in accordance with the Plat and by separate recorded easement documents.

    (b)    No building shall be located over, under, upon or across any portion of any utility easement. The Owner of each Tract shall have the right to construct, keep and maintain concrete drives, fences, and similar improvements across any utility easement, and shall be entitled to cross such easements at all times for purposes of gaining access to and from such Tracts, provided, however, any concrete drive, fence or similar improvement placed upon such Utility Easement by the Owner shall be constructed, maintained and used at Owner's risk and, as such, the Owner of each Tract subject to said Utility Easements shall be

3

responsible for (i) any and all repairs to the concrete drives, fences and similar improvements which cross or are located upon such Utility Easements and (ii) repairing any damage to said improvements caused by the Utility District or any public utility in the course of installing, operating, maintaining, repairing, or removing its facilities located within the Utility Easements.

### ARTICLE III
### USE RESTRICTIONS

**Section 3.01** Single Family Residential Construction. Except as provided below, no building shall be erected, altered, placed or permitted to remain on any Tract other than one dwelling unit per each Tract to be used for single family residential purposes. One guest/servants house may be built provided said guest/servants house contains no less than five hundred (500) square feet, no more that one-thousand (1000) square feet, is built after or while the main dwelling is being built and has prior approval of the Architectural Control Committee. All residences must have a garage. Detached garages and work shops may not be constructed on the Property prior to the main dwelling being built. Barns and/or storage buildings may be constructed on the property prior to the main dwelling being built provided they are approved in writing by the Architectural Control Committee prior to being erected, altered or placed on the property and are placed on the rear half of the property, out of view of any road, and behind the intended dwelling site. All structures must be approved in writing by the Architectural Control Committee prior to being erected, altered or placed on the Property. The term "dwelling" does not include either double wide or manufactured homes, or single wide mobile homes, or prefab houses regardless of whether the same are placed upon permanent foundation, and said homes are not permitted within the Subdivision. All dwellings must have at least one thousand eight hundred (1800) square feet of living area for one story homes and two thousand (2000) square feet of living area for two story homes, with at least one thousand (1000) square feet on the ground floor, excluding porches, and be built with new construction material. Any building, structure or improvements commenced on any tract shall be completed as to the exterior finish and appearance within six (6) months from the commencement date. All garages, including detached garages, will be of the same general construction as the main dwelling and located on the tract according to the Committee approved building site plan and shall be suitable for not less that two (2) automobiles. All garages must be side or rear entry. No carports shall be allowed.

**Section 3.02** Composite Building Site. Any Owner of one or more adjoining Tracts (or portions thereof) may, with the prior written approval of the Architectural Control Committee, and with approval of the Comal County Commissioner's Court, if required, consolidate such Tracts or portions into one building site, with the privilege of placing or constructing improvements on such resulting site, in which case the side setback lines shall be measured from the resulting side Property lines rather than from the Tract lines as indicated on the Plat. Public utility and drainage easements are exempt from this provision.

**Section 3.03** Location of the Improvements upon the Tract. No building of any kind

4


shall be located on any tract nearer than forty feet (40') to the side Property line, no nearer than seventy-five feet (75') to the front Property line and no nearer than seventy-five feet (75') to the rear Property line, provided however, as to any tract, the Architectural Control Committee may waive or alter any such setback line, if the Architectural Control Committee in the exercise of the Architectural Control Committee's sole discretion, such waiver, or alteration is necessary to permit effective utilization of a tract. Any such waiver or alteration must be in writing and recorded in the Official Public Records of Comal County, Texas. All dwellings placed on Subject Property must be equipped with Class I Aerobic Septic tank system that meet all applicable laws, rules, standards and specifications, and all such dwellings must be served with water and electricity.

Section 3.04 Use of Temporary Structures. No structure of a temporary character, whether trailer, motor home, basement, shack, garage, barn or other outbuilding shall be maintained or used on any Tract at any time as a residence, either temporarily or permanently, except as provided below. No Tract shall be used as a camping ground. A property owner may use an RV camper or motor home as his/her temporary residence for up to six (6) months during construction provided an approved septic system has been installed and the RV camper or motor home is placed behind the construction site. After the dwelling is complete an RV camper or motor home may be stored on the tract provided it is stored in compliance with Section 3.17 of these restrictions. The Declarant or the Committee shall have the right to have any RV or motor home found to be in violation of these restrictions removed and stored at the expense of the owner; and, for these purposes Declarant and/or the representative of the Committee is granted express written consent to remove the same without penalty or offense.

The Developer reserves the exclusive right to erect, place and maintain a mobile home, camper or motor home in or upon any portion of the Subdivision as in its sole discretion may be necessary or convenient while selling Tracts, selling or constructing residences and constructing other improvements within the Subdivision. The Developer is not restricted by any of the above time constraints in this provision.

Section 3.05 Repair of Buildings. All improvements upon any of the Property shall at all times be kept in good condition and repair and adequately painted or otherwise maintained by the Owner thereof.

Section 3.06 Alteration or Removal of Improvements. Any construction, other than normal maintenance, which alters the exterior appearance of any Improvement, or the removal of any Improvement, shall be performed only with the prior written approval of the Architectural Control Committee.

Section 3.07 Roofing Materials. The roof surface of all principal and secondary structures including garages and domestic living quarters shall be of slate, stone, concrete tile, clay tile, or other tile of a ceramic nature, composition shingles with a twenty-five (25) year or more warranty; or they may be metal, left natural or painted a color approved by the Architectural Control Committee, using standing or battened seams. The Architectural Control Committee shall have the authority and sole

5

71

discretion to approve other roof treatments and materials if the form utilized will be harmonious with the surrounding homes and subdivision as a whole.

Section 3.08 Construction in Place. All dwellings constructed on the Property shall be built in place on the applicable Lot. The use of prefabricated materials for any improvements, including but not limited to fences, shall be allowed only with the prior written approval of the Architectural Control Committee.

Section 3.09 Color. All exterior color schemes on any structure must be approved by the Architectural Control Committee prior to use.

Section 3.10 Model Homes. Notwithstanding anything herein contained, Builders shall be allowed to construct model homes as long as such model homes conform to these restrictions.

Section 3.11 Masonry. The exterior walls of the main residence constructed on any lot shall be at least seventy-five percent (75%) masonry or masonry veneer, inclusive of door, window and similar openings. However, all exterior walls exposed to view from the front property line shall be constructed of no less that seventy-five percent (75%) masonry or masonry veneer exclusive of all door, window or similar openings. Masonry and Masonry veneer includes stucco, ceramic tile, clay, brick, rock and all other materials commonly referred to in the New Braunfels, Texas area as masonry. Notwithstanding this provision, log houses not meeting the above masonry requirements may be allowed with the prior written approval of the Architectural Control Committee.

Section 3.12 Walls, Fences, and Mail Boxes. Walls and fences, if any, must be approved prior to construction by the Architectural Control Committee and, unless otherwise permitted by the Architectural Control Committee, must be constructed of wood, metal, masonry, masonry veneer, smooth wire or barbed wire. Electric wire and chain link fencing shall not be permitted. All wooden fences must be painted and the color of such paint must be approved by the Architectural Control Committee. All individual mail boxes (if approved by the postal department) must be of masonry construction and approved by the Architectural Control Committee.

Section 3.13 Antennas, Towers, and Satellite Dishes. Antennas, towers, or satellite dishes of any kind shall not exceed ten feet above the roof of the Dwelling or Accessory Building whichever is higher. Any antennae, tower or satellite dish must be located to the side or rear of the Dwelling or Accessory Building and not within forty feet (40') of any side Property line or seventy-five feet (75') of any rear Property line. Nothing herein shall be construed to conflict with the latest rules and regulations set forth by the Federal Communications Commission.

Section 3.14 Prohibition of Offensive Activities. No Activity, whether for profit or not, shall be conducted on any Tract which is not related to single family residential purposes, unless said activity meets the following criteria: (a) no additional exterior sign of activity is present, (b) it is the type of action that usually happens in a home, (c) no additional traffic, that would not be there normally, is created, and (d) nothing

6

72

dangerous is present that should not be there. This restriction is waived in regard to the customary sales activities required to sell homes in the Subdivision. The discharge or use of firearms is expressly prohibited. Hunting is expressly prohibited. The Association shall have the sole and absolute discretion to determine what constitutes a nuisance or annoyance.

Section 3.15 Garbage and Trash Disposal. Garbage and trash or other refuse accumulated in this Subdivision shall not be permitted to be dumped at any place upon adjoining land where a nuisance to any residence of this Subdivision is or may be created. No Tract shall be used or maintained as a dumping ground for rubbish. Trash, garbage or other waste shall not be allowed to accumulate, shall be kept in sanitary containers and shall be disposed of regularly. All equipment for the storage or disposal of such material shall be kept in a clean and sanitary condition.

Section 3.16 Junked Motor Vehicles Prohibited. No tract shall be used as a depository for abandoned or junked motor vehicles. No junk of any kind or character shall be kept on any Tract.

Section 3.17 Trailers, Rvs, Boats. All trailers, travel trailers, graders, recreational vehicles (RV's), trucks (other than pickups of a size one (1) ton or less), boats, tractors, campers, wagons, buses, motorcycles, motor scooters and lawn or garden maintenance equipment shall be kept at all times, except when in actual use, in enclosed structures or screened from view from common areas, public or private thoroughfares and adjacent properties.

Section 3.18 Signs. No signs, advertising, billboards or advertising structure of any kind may be erected or maintained on any Tract without the consent in writing of the Architectural Control Committee, except one (1) professionally made sign not more than twenty-four inches (24") by thirty inches (30") advertising Owner's Tract for sale or rent, and one (1) professionally made sign, not more than twelve inches (12") by twenty-four inches (24") identifying the Tract owner's name or names. The term "professionally made sign" does not include the plastic pre-made "for sale" or "for rent" signs. No sign shall be nailed to a tree. Declarant or any member of such Committee shall have the right to remove any such sign, advertisement or billboard or structure which is placed on any Tract in violation of these restrictions, and in doing so, shall not be liable, and are hereby expressly relieved from, any liability for trespass or other tort in connection therewith, or arising from such removal.

Section 3.19 Animal Husbandry. No animals, livestock or poultry of any kind shall be raised, bred or kept on any Tract except that one (1) horse per every 2.5 acres may be kept, as long as it does not become a nuisance or threat to other Owners. Provided, however, animals being raised for 4-H or school sponsored programs will be permitted. No pigs or hogs will be permitted under any circumstances or programs. All horses, cows and 4-H animals being raised by individual tract owners must be kept in a fenced area on the owner's tract. No overgrazing is permitted on any portion of the lot. Dogs, cats, or other common household pets may be kept on a Tract. Dogs must be kept in a kennel, dog run, or fenced in area that confines said dog(s) to that area, and for these purposes chain link fencing shall be permitted provided, however,

7

73

no such fenced in area shall be located adjacent to any side, front or rear boundary line. Dogs will not be permitted to run loose in the Subdivision and must be vaccinated for rabies according to State law once a year and registered with Comal County once a year.

Section 3.20 Mineral Development. No commercial oil drilling, oil development operations, oil refining, quarrying or mining operation of any kind shall be permitted upon or in any Tract. No derrick or other structures designed for the use of boring for oil or natural gas shall be erected, maintained or permitted upon any Tract.

Section 3.21 Drainage. Natural established drainage patterns of streets, tracts or roadway ditches will not be impaired by any person or persons. Driveway culverts must be installed and will be of sufficient size to afford proper drainage of ditches without backing water up into ditch or diverting flow. Drainage culvert installation is subject to the inspection and approval of the Architectural Control Committee and to County requirements.

Section 3.22 Re-subdivision. Except as provided below or as otherwise permitted in these restrictions, no tract shall be re-subdivided or split. Lots may be combined into one Lot for building purposes and the interior common boundary line shall be extinguished by filing a recordable document of record, joined by the Declarant, or Architectural Control Committee, or its duly authorized representative, declaring the same to be extinguished. Thereafter, all set back lines shall refer to the exterior property lines. Combined Lots shall nevertheless be considered as separate Lots for assessment purposes, unless otherwise determined by the Architectural Control Committee. Public utility and drainage easements are exempt from this provision.

Builder reserves the right to further subdivide Lot 220. This right is assignable by Developer at its sole discretion. The assignment, if any, shall be executed at such time as Lot 220 is sold by Developer and shall be evidence in writing and filed of record. This right is exclusive to Developer and shall not be affected by the transfer of architectural and property owner association control.

In the event of the failure of Owner to comply with the above requirements after ten (10) days written notice thereof, the Association or their designated agents may, without liability to the Owner, Contractor or any occupants of the Tract in trespass or otherwise, enter upon (and/or authorize one or more others to enter upon) said Tract, cause to be removed, such garbage, trash and rubbish or do any other thing necessary to secure compliance with this Declaration at the expense of Owner. Payment for the charges by such Owner shall be payable on the first day of the next calendar month.

ARTICLE IV
ARCHITECTURAL CONTROL COMMITTEE

Section 4.01 Basic Control
(a)    No building or other improvements of any character shall be erected or placed, or the erection or placing thereof commenced or changes made in the design or exterior appearance thereof (excluding, without

8

limitation, any staining, painting or siding), or any addition or exterior alteration made thereto after original by construction, or demolition or destruction by voluntary action made thereto after originally constructed, on any tract in the Subdivision until the obtaining of the necessary approval (as hereinafter provided) from the Committee of the construction plans and specification for the construction or alteration of such improvements or demolition or destruction of existing improvements by voluntary action. Approval shall be granted or withheld based on matters of compliance with the provisions of this instrument.

(b)     Each application made to the Committee, or to the Developer, shall be accompanied by two sets of plans and specifications for all proposed construction (initial or alteration) to be done on such Tract including plot plans showing location on the tract.

Section 4.02 Architectural Control Committee.

(a)     The authority to grant or withhold architectural control approval as referred to above is initially vested in the Developer; provided, however, the authority of the Developer shall cease and terminate upon the election of the Architectural Control Committee of the Association (sometimes herein referred to as the "Committee"), in which event such authority shall be vested in and exercised by the Committee (as provided in (b) below), hereinafter referred to, except as to plans and specifications and plot plans theretofore submitted to the Developer which shall continue to exercise such authority over all such plans, specifications and plot plans. Notwithstanding, after the Control Transfer Date, both the Developer and the Architectural Control Committee shall have the right to grant a variance from the building set-back line restrictions. Either party may grant this variance as it determines in its sole discretion is needed, without the consent of the other. The term "Committee", as used in this Declaration, shall mean or refer to the Developer or to the RIVER CHASE Architectural Control Committee composed of members of the Association, as applicable.

(b)     On or after such time as fifty-one percent (51%) of all of the Tracts in all sections of the Subdivision are conveyed by Developer [from time to time hereafter referred to as the "Control Transfer Date"), the Developer shall cause an instrument transferring control to the Association to be placed of record in the Official Public Records of Comal County, Texas (the effective control Transfer Date shall be the date of its recording). Thereupon, the Developer shall appoint a Committee of three (3) members to be known as the RIVER CHASE Architectural Control Committee who shall serve until the next succeeding annual meeting following the Control Transfer Date. From and after the Control Transfer Date, each member of the Committee must be an Owner of the Property in some Section of RIVER CHASE. Additionally, the Developer shall have the right to discontinue the exercise of architectural control privileges and

9

arrange for the transfer to the Association at any time prior to the Control Transfer Date by filing a statement and instrument to such effect in the Official Public Records of Comal County, Texas.

Section 4.03 Effect of Inaction. Approval or disapproval as to architectural control matters as set forth in the preceding provisions of this Declaration shall be in writing. In the event that the authority exercising the prerogative of approval or disapproval (whether the Developer or the Committee) fails to approve or disapprove in writing any plans and specifications and plot plans received by it in compliance with the preceding provisions within thirty (30) days following such submissions, such plans and specifications and plot plan shall be deemed approved and the construction of any such building and other improvements may be commenced and proceeded with in compliance with all such plans and specifications and plot plan and all of the other terms and provisions hereof.

Section 4.04 Effect of Approval. The granting of the aforesaid approval (whether in writing or by lapse of time) shall constitute only an expression of opinion by the Committee that the terms and provisions hereof shall be complied with if the building and/or other improvements are erected in accordance with said plans and specifications and plot plan; and such approval shall not constitute any nature of waiver or estoppel either as to the persons expressing such approval or any other person in the event that such building and/or improvements are not constructed in accordance with such plans and specifications and plot plan, but, nevertheless, fail to comply with the provisions hereof. Further, no person exercising any prerogative of approval of disapproval shall incur any liability by reasons of the good faith exercise thereof.

Section 4.05 Variance. The Developer or the Committee, as the case may be, may authorize variances from compliance with any of the provisions of this Declaration or minimum acceptable construction standards or regulations and requirements as promulgated from time to time by the Developer or the Committee, when circumstances such as topography, natural obstructions, Tract configuration, Tract size, hardship, aesthetic or environmental considerations require a variance. The Developer and the Committee reserve the right to grant variances as to building set-back lines. Such variances must be evidenced in writing and shall become effective when signed by the Developer or by at least a majority of the members of the Committee. If any such variances are granted, no violation of the provisions of this Declaration shall be deemed to have occurred with respect to the matter for which the variance is granted; provided, however, that the granting of a variance shall not operate to waive any of the provisions of this Declaration for any purpose except as to the particular Property and particular provisions hereof covered by the variance, nor shall the granting of any variance affect in any way the Owner's obligation to comply with all governmental laws and regulations affecting the Property concerned and the Plat.

## ARTICLE V
## NBRC PROPERTY OWNERS ASSOCIATION

10

76

Section 5.01 Membership. Every person or entity who is a record owner of any Tract which is subject to the Maintenance charge (or could be following the withdrawal of an exemption therefrom) and other assessments provided herein, shall be a "Member" of the Association. The foregoing is not intended to include persons or entities who hold an interest merely as security for the performance of an obligation or those having only an interest in the mineral estate. No Owner shall have more than one membership for each Tract owned by such Member. Memberships shall be appurtenant to and may not be separated from the ownership of the Tracts, regardless of the number of persons who may own a Tract (such as husband and wife, or joint tenants, etc.) there shall be but one membership for each Tract. Additionally, the Directors of the Association must be Members of the Association (as more particularly described in the By-laws). Ownership of the Tracts shall be the sole qualification for membership. The voting rights of the Members are set forth in the Bylaws of the Association. However, the Restrictive covenants will not be construed as to assess the Veterans Land Board or the State of Texas. Any assessments are the personal obligation of the Veteran purchaser, his successors, heirs and assigns. Any lien imposed by the restrictive covenants does not affect the Veterans Land Board's interest in the Property.

Section 5.02 Non-Profit Corporation. NBRC PROPERTY OWNERS ASSOCIATION, a non-profit corporation, has been (or will be) organized and it shall be governed by the Articles of Incorporation and Bylaws of said Association; and all duties, obligations, benefits, liens and rights hereunder in favor of the Association shall vest in said corporation.

Section 5.03 Bylaws. The Association has adopted or may adopt whatever Bylaws it may choose to govern the organization or operation of the Subdivision and the use and enjoyment of the Tracts and Common Areas, provided that the same are not in conflict with the terms and provisions hereof.

Section 5.04 Owner's Right of Enjoyment. Every Owner shall have a beneficial interest of use and enjoyment in and to the Common Areas and such right shall be appurtenant to and shall pass with the title to every assessed Tract, subject to the following provisions:

(a)     the right of the Association, with respect to the Common Areas, to limit the number of guests of Owners;

(b)     the right of the Association, in accordance with its Articles and Bylaws (and until fifty-one percent (51%) of all tracts in the Subdivision are sold), subject to the prior written approval of the Developer, to (i) borrow money or the purpose of improving and maintaining the Common Areas and facilities (including borrowing from the Developer or any entity affiliated with the Developer) and (ii) mortgage said Property, however, the rights of such mortgage of said Property shall be subordinate to the rights of the Owners hereunder;

(c)     the right of the Association to suspend the Members voting rights and

11

the Member's and Related Users right to use any recreational facilities within the Common Areas during any period in which the Maintenance Charge or any assessment against this Tract remains unpaid;

(d)     the right of the Association to suspend the Member's voting rights and the Member's and Related Users' right to use any recreational facilities within the Common Area, after notice and hearing by the Board of Directors, for the infraction or violation by such Member or Related Users of this Declaration or the "Rules and Regulations', as hereinafter defined, which suspension shall continue for the duration of such infraction or violation, plus a period not to exceed sixty (60) days following the cessation or curing of such infraction or violation.

## ARTICLE VI
### MAINTENANCE FUND

Section 6.01 *Maintenance Fund Obligation*. Each Owner of a tract by acceptance of a deed therefore, whether or not it shall be expressed in any such deed or other conveyance, is deemed to covenant and agrees to pay to the Association a monthly maintenance charge (the "Maintenance Charge"), and any other assessments or charges hereby levied. The Maintenance Charge and any other assessments or charges hereby levied, together with such interest thereon and costs of collection thereof, as hereinafter provided, shall be a charge on the Tracts and shall be a continuing lien upon the Property against which each such Maintenance Charge and other charges and assessments are made.

Section 6.02 *Basis of the Maintenance Charge*.

(a)     The Maintenance Charge referred to shall be used to create a fund to be known as the "Maintenance Fund", which shall be used as herein provided; and each such Maintenance Charge (except as otherwise hereinafter provided) shall be paid by the Owner of each Tract (or residential building site) to the Association. The Maintenance Charge for the year of purchase shall be pro-rated at closing and then shall be paid annually, in advance, on or before the first day of the first month of each calendar year. Provided, however if such owner owns more than one tract in the subdivision, such Owner shall pay only twice the assessment of one (1) tract no matter how many tracts are owned or in the event as Owner obtains consent from the Committee for a Composite Building site pursuant to Section 3.02 hereof, such Composite Building Site shall be considered for the Maintenance Charge of one Tract for beginning upon the completion of the improvements thereon.

(b)     Any Maintenance Charge not paid within thirty (30) days after the due date shall bear interest from the due date at the lesser of (i) the rate of eighteen percent (18%) per annum or (ii) the maximum rate permitted by law. The Association may bring an action at law against the Owner personally obligated to pay the same, or foreclose the hereinafter

12

73

described lien against the Owner's Tract. No Owner may waive or otherwise escape liability for the Maintenance Charge by non-use of any Common Areas or recreational facilities available for use by Owners of the Subdivision or by the abandonment of his tract.

(c) The initial amount of the Maintenance Charge applicable to each Tract will be $120.00 per year due in advance, payable on January 1 of each year. All other matters relating to the Maintenance Charge and the collection, expenditures and administration of the Maintenance Fund shall be determined by the Developer or the Board of Directors of the Association, subject to the provisions hereof.

(d) The Association, from and after the Control Transfer Date, shall have the further right at any time, with a majority vote of all association members, to adjust or alter said Maintenance Charge from year to year as it deems proper to meet the reasonable operating expenses and reserve requirements of the Association in order for the Association to carry out its duties hereunder.

Section 6.03 _Creation of Lien and Personal Obligation._ In order to secure the payment of the Maintenance Charge, and other charges and assessments hereby levied, each Owner of a Tract in the Subdivision, by such party's acceptance of a deed thereto, hereby grants to the Association a contractual lien on such Tract which may be foreclosed on by non-judicial foreclosure, pursuant to the provisions of Section 51.002 of the Texas Property Code (and any successor statute); and each such owner hereby expressly grants the Association a power of sale in connection therewith. The Association shall, whenever it proceeds with non-judicial foreclosure pursuant to the provisions of said Section 51.002 of the Texas Property Code and said power of sale, designate in writing a Trustee to post or cause to be posted all required notices of such foreclosure sale and to conduct such foreclosure sale. The Trustee may be changed at any time and from time to time by the Association by means of written instrument executed by the President or any Vice-President of the Association and filed for record in the Official Public Records of Comal County, Texas. In the event that the Association has determined to non-judicially foreclose the lien provided herein pursuant to the provisions of said Section 51.002 of the Texas Property Code and to exercise the power of sale hereby granted, the Association, or the Association's agent, shall give notice of foreclosure sale as provided by the Texas Property Code as then amended. Upon request by Association, the Trustee shall give any further notice of foreclosure sale as may be required by the Texas Property Code as then amended, and shall convey such Tract to the highest bidder for cash by the General Warranty Deed. Out of the proceeds of such sale, if any, there shall first be paid all expenses incurred by the Association in connection with such default, including reasonable attorney's fees and a reasonable trustee's fee; second, from such proceeds there shall be paid to the Association an amount equal to the amount in default; and third, the remaining balance shall be paid to such Owner. Following any such foreclosure, each occupant of any such Tract foreclosed on and each occupant of any improvements thereon shall be deemed to be a tenant at sufferance and may be removed from possession by any and all lawful means, including a judgment for possession in action of forcible detainer

13

79

and the issuance of a writ of restitution thereunder.

In the event of non-payment by any Owner of any Maintenance Charge or other charge or assessment levied hereunder, the Association may, in addition to foreclosing the lien hereby retained, and exercising the remedies provided herein, upon ten (10) days prior written notice thereof to such non-paying Owner, exercise all other rights and remedies available at law or in equity.

It is the intent of the provisions of this 6.03 to comply with the provisions of said Section 51.002 of the Texas Property Code relating to non-judicial sales by power of sale and, in the event of the amendment of said Section 51.002 of the Texas Property code hereafter, the President or any Vice-President of the Association, acting without joinder of any other Owner or mortgagee or other person may, by amendment to this Declaration file in the Official Public Records of Comal County, Texas, amend the provisions hereof so as to comply with said amendments to Section 51.002 of the Texas Property Code.

Section 6.04 Notice of Lien. In addition to the right of the Association to enforce the Maintenance Charge or other charge or assessment levied hereunder, the Association may file a claim or lien against the Tract of the delinquent Owner by recording a notice ("Notice of Lien") setting forth (a) the amount of the claim of delinquency, (b) the interest thereon, (c) the costs of collection which have accrued thereon, (d) the legal description and street address of the Tract against which the lien is claimed and (e) the name of the Owner thereof. Such Notice of Lien shall be signed and acknowledged by an officer of the Association or other duly authorized agent of the Association. The lien shall continue until the amounts secured hereby and all subsequently accruing amounts are fully paid or otherwise satisfied. When all amounts claimed under the Notice of Lien and all other costs and assessments which may have accrued subsequent to the filing of the Notice of Lien have been fully paid or satisfied, the Association shall execute and record a notice releasing the lien upon payment by the Owner of a reasonable fee as fixed by the Board of Directors to cover the preparation and recordation of such release of lien instrument.

Section 6.05 Liens Subordinate to Mortgages. The lien described in this Article VI shall be deemed subordinate to a first lien or other liens of any bank, insurance company, savings and loan association, university, pension and profit sharing trusts or plans, or any other third party lender, including Developer, which may have heretofore or may hereafter lend money in good faith for the purchase or improvement of any Tract and any renewal, extension, rearrangement or refinancing thereof. Each such mortgagee of a mortgage encumbering a Tract who obtains title to such Tract pursuant to the remedies provided in the deed of trust or mortgage or by judicial foreclosure shall take title to the Tract free and clear of any claims for unpaid Maintenance Charges or other charges of assessments against such Tract which accrued prior to the time such holder acquired title to such Tract. No such sale or transfer shall relieve such holder from liability for any Maintenance Charge or other charges or assessments thereafter becoming due or from the lien thereof. Any other sale or transfer of a Tract shall not affect the Association's lien for Maintenance Charges or other charges or assessments. The Association shall make a good faith

14

Doc# 9906031412

effort to give each such mortgagee sixty (60) days advance written notice of the Association's proposed foreclosure of lien described in Section 6.01 hereof, which notice shall be sent the nearest office of such mortgagee by prepaid United States registered or Certified mail, return receipt requested, and shall contain a statement of delinquent Maintenance Charges or other charges or assessments upon which the proposed action is based provided, however, the Association's failure to give such notice shall not impair or invalidate any foreclosure conducted by the Association pursuant to the provisions of this Article VI.

Section 6.06 _Purpose of the Maintenance Charges_. The Maintenance Charge levied by the Developer or the Association shall be used exclusively for the purpose of promoting the recreation, health, safety, and welfare of the Owners of the Subdivision which hereafter may become subject to the jurisdiction of the Association. In particular, the Maintenance Charge shall be used for any improvement or services in furtherance of these purposes and the performance of the Association's duties described in Article VIII, including the maintenance of any Common Areas, any Drainage Easements and the establishment and maintenance of a reserve fund for maintenance of any Common Areas. The Maintenance Fund may be expended by the Developer or the Association for any purposes which, in the judgment of the Association, will tend to maintain the Property values in the Subdivision, including, but not limited to, providing funds for the actual cost to the Association of all taxes, insurance, repairs, energy charges, replacement and maintenance of the Common Area as may from time to time be authorized by the Association. Except for the Association's use of the Maintenance Charge to perform its duties described in this Declaration and in the Bylaws, the use of the Maintenance Charge for any of these purposes is permissive and not mandatory. It is understood that the judgment of the Association as to the expenditure of said funds shall be final and conclusive so long as such judgment is exercised in good faith.

Section 6.07 _Handling of Maintenance Charges._ The collection and management of the Maintenance Charge or other charge or assessment levied hereunder, shall be performed by the Developer until the Control Transfer Date, at which time the Developer shall deliver to the Association all funds on hand together with all books and records of receipt and disbursements. The Developer and, upon transfer, the Association, shall maintain separate special accounts for these funds, and Owners shall be provided at least annually information on the Maintenance Fund.

## ARTICLE VII
## DEVELOPER'S RIGHTS AND RESERVATIONS

Section 7.01 _Period of Developer's Rights and Reservations_. Developer shall have, retain and reserve certain rights as set forth in this declaration with respect to the Association and the Common Area from the date hereof, until the earlier to occur of (i) the Control Transfer Date or (ii) Developer's written notice to the Association of Developer's termination of the rights described in Article VII hereof, less, save and except those rights set forth in Sections 7.03, 7.04 and 7.05. The rights in Sections 7.03, 7.04 and 7.05 shall be released at such time as a document relinquishing said rights is filed of record or the developer no longer holds record title to any lots in the

15

Doc# 9906031418

subdivision. The rights and reservations hereinafter set forth shall be deemed excepted and reserved in each conveyance of a Tract by Developer to an Owner whether or not specifically stated therein and in each deed or other instrument by which any Property within the Control Area is conveyed by Developer. The rights, reservations and easements hereafter set forth shall be prior and superior to any other provisions of this Declaration and may not, without Developer's prior written consent, be modified, amended, rescinded or affected by any amendment of this Declaration. Developer's consent to any one such amendment shall not be construed as a consent to any other or subsequent amendment.

Section 7.02 Right to Construct Additional Improvements in Common Area. Developer shall have and hereby reserves the right (without the consent of any other Owner), but shall not be obligated to construct additional improvements within the Common Area at any time and from time to time in accordance with this Declaration for the improvement and enhancement thereof and for the benefit of the Association and Owners, so long as such construction does not directly result in the increase of such Maintenance Charge. Developer shall, upon the Control Transfer Date, convey or transfer such improvements to the Association and the Association shall be obligated to accept title to care for and maintain the same as elsewhere provided in this Declaration.

Section 7.03 Developer's Rights to Use Common Areas in Promotion and Marketing of the Property. Developer shall have and hereby reserves the right to reasonable use of the Common Area and of services offered by the Association in connection with the promotion and marketing of land within the boundaries of the Property. Without limiting the generality of the foregoing, Developer may erect and maintain on any part of the Common Area such signs, temporary buildings and other structures as Developer may reasonably deem necessary or proper in connection with the promotion, development and marketing of land within the Property; may use vehicles and equipment within the Common Area for promotional purposes; and may permit prospective purchasers of Property within the boundaries of the Property, who are not Owners or Members of the Association, to use the Common Area at reasonable times and in reasonable numbers; and may refer to the services offered by the Association in connection with the development, promotion and marketing of the Property.

Section 7.04 Developer's Rights to Grant and Create Easements. Developer shall have and hereby reserves the right, without the consent of any other Owners or the Association, to grant or create temporary or permanent easements, for access, utilities, pipeline easement, cable television systems, communication and security systems, drainage, water and other purposes incidental to development, sale, operation and maintenance of the Subdivision, located in, on, under, over and across (i) the Tracts or other Property owned by Developer, (ii) the Common Area, and (iii) existing utility easements. Developer also reserves the right, without the consent of any other Owner or the Association, to (i) grant or create temporary or permanent easements for access over and across the streets and roads within the Subdivision.

Section 7.05 Developer's Rights to Convey Additional Common Area to the Association. Developer shall have and hereby reserves the right, but shall not be

16

82

obligated to, convey additional real Property and improvements thereon, if any, to the Association as Common Area at any time and from time in accordance with this Declaration, without the consent of any other Owner or the Association.

Section 7.06 Annexation of Additional Areas. Developer may cause additional real property to be annexed to the Property, by causing a written Annexation Declaration confirming the annexation thereof, adopting these Restrictions, to be placed of record in the Official Public Records of Comal County, Texas. At that point the annexed property shall become a part of this Subdivision and shall be subject to all of the Restrictions herein set forth the same as if originally included. No consent shall be required of the Association or any Member thereof, each Owner being deemed to have appointed Developer as his agent and attorney-in-fact to effect this Annexation, which power hereby granted to Developer is and shall be a power coupled with an interest. Thereafter the Association shall be the Association for the entirety of the Subdivision, the same as if the Property were included in the first instance. The Owner of the Annexed Property shall be subject to these Restrictions and shall be a member of the Association and shall be entitled to all of the rights and benefits provided members.

### ARTICLE VIII
### DUTIES AND POWERS OF THE PROPERTY OWNERS ASSOCIATION

Section 8.01 General Duties and Powers of the Association. The Association has been formed to further the common interest of the Members. The Association, acting through the Board of Directors or through persons to whom the Board of Directors has delegated such powers (and subject to the provisions of the Bylaws), shall have the duties and powers hereinafter set forth and, in general, the power to do anything that may be necessary or desirable to further the common interest of the members, to maintain, improve and enhance the Common Areas and to improve and enhance the attractiveness, desirability and safety of the Subdivision. The Association shall have the authority to act as the agent to enter into any and all contracts on behalf of the Members in order to carry out the duties, powers and obligations of the Association as set forth in this Declaration.

Section 8.02 Duty to Accept the Property and Facilities Transferred by Developer. The Association shall accept title to any Property, including any improvements thereon and personal property transferred to the Association by Developer, and equipment related thereto, together with the responsibility to perform any and all administrative functions and recreation functions associated therewith (collectively herein referred to as "Functions"), provided that such Property and Functions are not inconsistent with the terms of this Declaration. Property interest transferred to the Association by Developer may include fee simple title, easements, leasehold interests and licenses to use such Property. Any Property or interest in Property transferred to the Association by Developer shall be within the boundaries of the Property. Any Property or interest in Property transferred to the Association by Developer shall, except to the extent otherwise specifically approved by resolution of the Board of Directors, be transferred to the Association free and clear of all liens and mortgages (other than the lien for Property taxes and assessments not then due and payable), but shall be subject to the terms of this Declaration, the terms of any declaration of covenants, conditions and

17

Doc# 9906031412

restrictions annexing such Property to the Common Area, and all easements, covenants, conditions, restrictions and equitable servitude or other encumbrances which do not materially affect the Owners authorized to use such Property. Except as otherwise specifically approved by resolution of the Board of Directors, no Property or Interest In Property transferred to the Association by the Developer shall impose upon the Association any obligation to make monetary payments to Developer or any affiliate of Developer including, but not limited to, any purchase price, rent, charge or fee. The Property or Interest in Property transferred to the Association by Developer shall not impose any unreasonable or special burdens of ownership of Property, including the management maintenance, replacement and operation thereof.

Section 8.03 Duty to Manage and Care for the Common Area. The Association shall manage, operate, care for, maintain and repair all Common Areas and keep the same in a safe, attractive and desirable condition for the use and enjoyment of the Members. The duty to operate, manage and maintain the Common Areas shall include, but not be limited to the following: establishment, operation and maintenance of a security system, if any, for the Subdivision; landscaping maintenance, repair and replacement of park, and management, maintenance, repair and upkeep of the subdivision entrances and other common areas.

Section 8.04 Other Insurance Bonds. The Association shall obtain such insurance as may be required by law, including workmen's compensation insurance, and shall have the power to obtain such other insurance and such fidelity, indemnity or other bonds as the Association shall deem necessary or desirable.

Section 8.05 Duty to Prepare Budgets. The Association shall prepare budgets for the Association, which budgets shall include a reserve fund for the maintenance of all Common Areas.

Section 8.06 Duty to Levy and Collect the Maintenance Charge. The Association shall levy, collect and enforce the Maintenance Charge and other charges and assessments as elsewhere provided in this Declaration.

Section 8.07 Duty to Provide Annual Review. The Association shall provide for an annual unaudited independent review of the accounts of the Association. Copies of the review shall be made available to any Member who requests a copy of the same upon payment by such Member of the reasonable cost of copying the same.

Section 8.08 Duties with Respect to Architectural Approvals. The Association shall perform functions to assist the Committee as elsewhere provided in Article IV of this Declaration.

Section 8.09 Power to Acquire Property and Construct Improvements. The Association may acquire Property or an Interest in Property (including leases) for the common benefit of Owners including Improvements and personal property. The Association may construct Improvements on the Property and may demolish existing Improvements.

18

Section 8.10. <u>Power to Adopt Rules and Regulations.</u> The Association may adopt, amend, repeal and enforce rules and regulations ("Rules and Regulations"), fines, levies and enforcement provisions as may be deemed necessary or desirable with respect to the interpretation and implementation of this Declaration, the operation of the Association, the use and enjoyment of the Common Areas, and the use of any other Property, facilities or improvements owned or operated by the Association.

Section 8.11 <u>Power to Enforce Restrictions and Rules and Regulations.</u> The Association (and any Owner with respect only to the remedies described in (ii) below) shall have the power to enforce the provisions of this Declaration and the Rules and Regulations and shall take such action as the Board of Directors deems necessary or desirable to cause such compliance by each Member and each Related User. Without limiting the generality of the foregoing, the Association shall have the power to enforce the provisions of this Declaration and of Rules and Regulations of the Association by any one or more of the following means: (i) By entry upon any Property, excluding main residence, within the Subdivision after notice and hearing (unless a bona fide emergency exists in which event this right of entry may be exercised without notice (written or oral) to the Owner in such manner to avoid any unreasonable or unnecessary interference with the lawful possession, use or enjoyment of the Improvements situated thereon by the Owner or any other person), without liability by the Association to the Owner thereof, for the purpose of enforcement of this Declaration or the Rules and Regulations; (ii) By commencing and maintaining actions and suits to restrain and enjoin any breach or threatened breach of the provisions of this Declaration or the Rules and Regulations; (iii) By exclusion, after notice and hearing, of any Member or Related User from use of any recreational facilities within the Common Areas during and for up to sixty (60) days following any breach of this Declaration or such Rules and Regulations by such Member or any Related User, unless the breach is a continuing breach in which case exclusion shall continue for so long as such breach continues; (iv) By suspension, after notice and hearing, of the voting rights of a Member during and for up to sixty (60) days following any breach by such Member or a Related User of a provision of this Declaration or such Rules and Regulations, unless the breach is a continuing breach in which case such suspension shall continue for so long as such breach continues; (v) By levying and collecting, after notice and hearing, an assessment against any Member for breach of this Declaration or such Rules and Regulations by such Member or a Related User which assessment reimbursed the Association for the costs incurred by the Association in connection with such breach; (vi) by levying and collecting, after notice and hearing, reasonable and uniformly applied fines and penalties, established in advance in the Rules and Regulations of the Association, from any Member or Related User for breach of this Declaration or such Rules and Regulations by such Member or a Related User; and (vii) By taking action itself to cure or abate such violation and to charge the expenses thereof, if any, to such violating Members, plus attorney's fees incurred by the Association with respect to exercising such remedy.

Before the Board may invoke the remedies provided above, it shall give registered notice of such alleged violation to Owner, and shall afford the Owner a hearing. If, after the hearing, a violation is found to exist, the Board's right to proceed with the listed remedies shall become absolute. Each day a violation continues shall be deemed

19

Doc# 9906031418

a separate violation. Failure of the Association, the Developer, or of any Owner to take any action upon any breach or default with respect to any of the foregoing violations shall not be deemed a waiver of their right to take enforcement action thereafter or upon a subsequent breach or default.

Section 8.12 Power to Grant Easements. In addition to any blanket easements described in this Declaration, the Association shall have the power to grant access, utility, drainage, water facility and other easements in, on, over or under the Common Area.

## ARTICLE IX
## GENERAL PROVISIONS

Section 9.01 Term. The provisions hereof shall run with all Property in RIVER CHASE UNIT THREE and shall be binding upon all Owners and all persons claiming under them for a period of forty (40) years from the date this Declaration is recorded, after which time said Declaration shall be automatically extended for successive periods of ten (10) years each, unless an instrument, signed by not less than two-thirds (2/3rds) of the Owners (including the Developer) of the Tracts has been recorded agreeing to amend or change, in whole or in part, this Declaration.

Section 9.02 Amendments. This Declaration may be amended or changed, in whole or in part, at any time by the written agreement or by signed ballots voting for such amendment, of not less than two-thirds (2/3rds) of all of the Owners (including Developer) of the Subdivision. There shall be one vote per Tract. Anyone owning more than one Tract shall have one vote for each Tract owned. If the Declaration is amended by a written instrument signed by those Owners entitled to cast not less than two-thirds (2/3rds) of all of the votes of the Owners of the Association, such amendment must be approved by said Owners within three hundred sixty-five (365) days of the date the first Owner executes such amendment. The date an Owner's signature is acknowledged shall constitute prima facie evidence of the date of execution of said amendment by such Owner. Those Members (Owners, including the Developer) entitled to cast not less than two-thirds (2/3rds) of all of the votes of the Members of the Association may also vote to amend this Declaration, in person, or by proxy, at a meeting of the Members (Owners, including the Declarant) duly called for such purpose, written notice of which shall be given to all Owners at least ten (10) days and not more than sixty (60) days in advance and shall set forth the purpose of such meeting. Notwithstanding any provision contained in the Bylaws to the Contrary, a quorum, for purposes of such meeting, shall consist of not less than seventy percent (70%) of all of the Members (in person or by proxy) entitled to vote. Any such amendment shall become effective when an instrument is filed for record in the Official Public Records of Comal County, Texas, accompanied by a certificate, signed by a majority of the Board of Trustees, stating that the required number of Members (Owners, including the Developer) executed the instrument amending this Declaration or cast a written vote, in person or by proxy, in favor of said amendment at the meeting called for such purpose. Copies of the written ballots pertaining to such amendment shall be retained by the Association for a period of not less than three (3) years after the date filing of the amendment or termination.

20

Doc# 9906031412

Section 9.03 <u>Amendment by the Developer.</u> The Developer shall have and reserves the right at any time and from time to time prior to the Control Transfer Date, without the joinder or consent of any Owner or other party, to amend this Declaration by an instrument in writing duly signed, acknowledged, and filed for record for the purpose of correcting any typographical or grammatical error, oversight, ambiguity or inconsistency appearing herein, provided that any such amendment shall be consistent with and in furtherance of the general plan and scheme of development as evidenced by this Declaration and shall not impair or adversely affect the vested Property or other rights of any Owner or his mortgagee. Additionally, Developer shall have and reserves the right at any time and from time to time prior to the Control Transfer Date, without the joinder or consent of any Owner of other party, to amend this Declaration by an instrument in writing duly signed, acknowledged and filed for record for the purpose of permitting the Owners to enjoy the benefits from technological advances, such as security, communications or energy-related devices or equipment which did not exists or were not in common use in residential subdivisions at the time this Declaration was adopted. Likewise, the Developer shall have and reserves the right at any time and from time to time prior to the Control Transfer Date, without the joinder or consent of any Owner or other party, to amend this Declaration by an instrument in writing duly signed, acknowledged and filed for record for the purpose of prohibiting the use of any device or apparatus developed and/or available for residential use following the date of this Declaration if the use of such device or apparatus will adversely affect the Association or will adversely affect the Property values within the Subdivision.

Section 9.04 <u>Severability.</u> Each of the provisions of this Declaration shall be deemed independent and severable and the invalidity or unenforceability or partial invalidity or partially unenforceability of any provision or portion hereof shall not affect the validity or enforceability of any other provision.

Section 9.05 <u>Liberal Interpretation</u>. The provisions of this Declaration shall be liberally construed as a whole to effectuate the purpose of this Declaration.

Section 9.06 <u>Successors and Assigns.</u> The provisions hereof shall be binding upon and inure to the benefit of the Owners, the Developer and the Association, and their respective heirs, legal representatives, executors, administrators, successors and assigns.

Section 9.07 <u>Effect of Violations on Mortgages.</u> No violation of the provisions herein contained, or any portion thereof, shall affect the lien of any mortgage or deed of trust presently or hereafter placed of record or otherwise affect the rights of the mortgagee under any such mortgage, the holder of any such lien or beneficiary of any such deed of trust; and any such mortgage, lien or deed of trust may, nevertheless, be enforced in accordance with its terms, subject, nevertheless, to the provisions herein contained.

Section 9.08 <u>Terminology.</u> All personal pronouns used in this Declaration and all exhibits attached hereto, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa. Title of Articles and Sections are for convenience only and neither limit nor amplify the provisions of this Declaration itself. The terms "herein", "hereof" and similar terms, as

21

used in this instrument, refer to the entire agreement and are not limited to referring only to the specific paragraph, Section or article in which such terms appear. All references in this Declaration to Exhibits shall refer to the Exhibits attached hereto.

### VETERAN PURCHASER PARTIAL RELEASE

Notwithstanding anything contained in the Restrictions to the contrary, a Veteran Purchaser shall be entitled to have a 1.00 acre tract released from the Veterans Land Board for a home site and same shall not be construed as a violation of the above Restrictive Covenants.

IN WITNESS WHEREOF, the undersigned, being the Developer herein, has hereunto set its hand of this _2nd_ day of _November_, 1999.

TEXAS SOUTHERLAND VENTURE, a
Massachusetts Joint Venture by
SOUTHERLAND PROPERTIES, INC.
a Texas Corporation, Joint Venturer

By: _____
JAY PATTERSON, Vice President



Doc# 9906031628
8 Pages 22
Date: 11/23/99 3:49:59 PM
Filed & Recorded in
Official Records of
COMAL COUNTY
JOY STREATER
COUNTY CLERK
Fees $51.00

THE STATE OF TEXAS          *
COUNTY OF _Comal_          *

This instrument was acknowledged before me on this the _8th_ day of _November_, 1999, by JAY PATTERSON, Vice President of SOUTHERLAND PROPERTIES, INC., a Texas Corporation, as Joint Venturer for TEXAS SOUTHERLAND VENTURE, a Massachusetts Joint Venture, in the capacity therein stated, on behalf of said Corporation.

CAROLYN J. DUNCAN
NOTARY PUBLIC
State of Texas
Comm. Exp. 06-01-2000

_____
NOTARY PUBLIC, STATE OF TEXAS
Notary's Name Printed:
_Carolyn J. Duncan_
My Commission Expires: _06-01-2000_

AFTER RECORDING RETURN TO:          PREPARED IN THE LAW OFFICE OF:
BOB R. KIESLING, P.C.                BOB R. KIESLING, P.C.
P. O. Box 311686                     P. O. Box 311686
New Braunfels, TX 78131-1686         New Braunfels, TX 78131-1686

Doc# 9906031628
8 Pages 22
Date: 11/23/99 1:10:24 PM
Filed & Recorded in
Official Records of
COMAL COUNTY
JOY STREATER
COUNTY CLERK
Fees $51.00

22



Doc# 9906031628

STATE OF TEXAS
COUNTY OF COMAL
I certify that this is a true and correct copy of the record FILED & RECORDED in the Official Public Records of Comal County on the date and time stamped thereon.

Joy Streater
County Clerk

87

# APPENDIX
# Tab 3
## Tex. Prop. Code §§ 202.002, 202.003

PROPERTY CODE

TITLE 11. RESTRICTIVE COVENANTS

CHAPTER 202. CONSTRUCTION AND ENFORCEMENT OF RESTRICTIVE
COVENANTS

\*      \*      \*

Sec. 202.002.  APPLICABILITY OF CHAPTER.  (a)  This chapter applies to all restrictive covenants regardless of the date on which they were created.

(b)  This chapter does not affect the requirements of the Community Homes for Disabled Persons Location Act (Article 1011n, Vernon's Texas Civil Statutes).

Added by Acts 1987, 70th Leg., ch. 712, Sec. 1, eff. June 18, 1987.

Sec. 202.003.  CONSTRUCTION OF RESTRICTIVE COVENANTS.  (a)  A restrictive covenant shall be liberally construed to give effect to its purposes and intent.

(b)  In this subsection, "family home" is a residential home that meets the definition of and requirements applicable to a family home under the Community Homes for Disabled Persons Location Act (Article 1011n, Vernon's Texas Civil Statutes).  A dedicatory instrument or restrictive covenant may not be construed to prevent the use of property as a family home. However, any restrictive covenant that applies to property used as a family home shall be liberally construed to give effect to its purposes and intent except to the extent that the construction would restrict the use as a family home.

Added by Acts 1987, 70th Leg., ch. 712, Sec. 1, eff. June 18, 1987.

\*      \*      \*